Case No. 23-1087 from the District of Nebraska, Tonya Huber v. Westar Foods, Inc. I'm Alexis Mullaney, and I'm here representing Tonya Huber, the appellant in this case. At trial, never ask a question to which you do not already know the answer. Why not? Because at trial, we want to present the facts in the light most favorable to our client. We don't want surprise facts messing up our version of the case. But contrast this against how we behave when we are meeting with a new client or interviewing a witness or taking a deposition. We ask lots of questions to which we do not already know the answer. Because in those situations, we're trying to understand. We're trying to know what's really happening. Now, this is not only true of lawyers. I have two kids, a four- and a six-year-old, and I walked into our office the other day, and they were sitting on the floor coloring with a bunch of felt-tip markers, and they were my felt-tip markers. And I asked them, why didn't you ask my permission? And my daughter said, because I knew you would say no. She didn't want to know the answer, so she didn't ask the question. The questions a person asks or doesn't ask can hold a clue to their motives. Westar claims that it fired Tawny Huber based on its honest belief that it was possible for Ms. Huber to call her supervisor sooner than she did, despite the fact that she was experiencing a diabetic episode. Huber, on the other hand, says she called as soon as possible. She was experiencing brain fog. She couldn't make sense. She was at her doctor's office all day. It was an emergency. Now, Westar is not required... Wait, wait. I thought she may be in the background of one of the phone calls from the son. Ms. Huber testified that she was not with her son that day. Now, Ms. Kelchin testified that she thought she could hear Ms. Huber in the background when she spoke with Ms. Huber's son. Westar is not required to be correct. They're not required to conduct an investigation. But their behavior in this case can still lead us to question their motives and whether this honest belief was held in good faith. When an employer asserts that it took an action based on its honest belief, but the evidence suggests the employer avoided exculpatory information, despite recognizing the gaps in their own comprehension, a juror could consider the employer's willful ignorance to be inconsistent with acting in good faith. This is very similar to what the First Circuit held in Gillen v. Ambulance Services, Inc., 283 F. 3rd. 11. The questions that Ms. Kelchin didn't ask in this situation should give us pause, in part because she was very humble about her own knowledge of diabetes. She knew that she didn't know anything about this condition. She said in her deposition that she was not a medical doctor, that she didn't know what it meant for someone's levels to be low. She testified that she didn't have any friend or family member that suffered from diabetes. And yet she didn't ask any questions. On December 20th, when Ms. Kelchin spoke with Tanya Huber's son, Tanya Huber's son said that Ms. Huber's levels were low. Ms. Kelchin said, I didn't ask what that was. We didn't go into depth about what the levels were or what was going on. The next day on the 21st, when Ms. Huber spoke with Ms. Kelchin, Ms. Huber said that Ms. Kelchin could talk to her doctor. She didn't. She provided Ms. Kelchin with a doctor's note. This is in the record on page 569. On that doctor's note, there is a fax number. There is a phone number. Kelchin could have cleared this up with a simple phone call. She didn't. Westo repeatedly refused Ms. Huber's request that she be provided FMLA paperwork for her doctor to fill out. She asked multiple times, can I please have this paperwork? I want my doctor to fill it out. And they said, no, no thank you. No additional information will be needed. A reasonable juror could infer from Kelchin's conduct that she did not ask questions that she didn't know the answers to because she didn't want to learn information that could lead her to have certain obligations to accommodate Ms. Huber for her diabetes, to give her that FMLA to which she was entitled. If Tanya Huber was unable to call Westar under their policy, if she called as soon as possible, that would mean she didn't violate the policy. Ms. Kelchin assumed that Ms. Huber could have called earlier. She should have called earlier because she had driven, because she had talked to her son. She should have been able to call her employer. But what was the basis for Ms. Kelchin assuming this? She didn't know anything about diabetes. She didn't ask any questions to Ms. Huber. The son had said she'd call later, right? He said she would call when she was able. According to him. What's your best evidence that the explanation given by the company was pretextual and that the true reason was not the rule violation but, in fact, the disability? I think the best evidence here that leads to the conclusion that there's a jury question is that Kelchin claims that Ms. Huber never told her she had diabetes. Kelchin testified two separate times in her deposition, very clearly, that prior to making the decision to terminate Ms. Huber, she didn't know that Ms. Huber was diabetic. Now, Kelchin's own notes say that Ms. Huber conveyed to her that her levels of diabetic were off. It says that. So I think it will be up for a jury to decide whether Kelchin is pretending to not know, if she was avoiding information that would have cleared this up, or whether she truly was just angry about the absences and fired her for this policy violation. This is a key fact. Whether or not the employer knew that the employee had a disability is incredibly material. Because, ultimately, the issue that my client wanted to prove at trial is that her employer acted on the basis of her known disability. That they knew about the disability. So the stacked issue, not only my client saying, I told Ms. Kelchin multiple times that I had diabetes, but Ms. Kelchin's own notes saying that she knew that my client had diabetes, I think that's the best piece of evidence. I'm not suggesting here that Ms. Kelchin's behavior, and not asking these questions, that that is dispositive evidence. That means that certainly she discriminated against my client. I'm only saying that a jury could consider that, could consider her behavior, along with other evidence of pretext, in finding that Westar fired Ms. Huber because of her known disability. Now, I'd also like to address the FMLA claims. The panel decision was unanimous with regards to the FMLA claims, but the entire decision was vacated. So I would like to also discuss those claims as well. I'd just like to point out, first of all, that for Ms. Huber's FMLA interference claim, she is not, the analysis is a little bit different from her ADA disability discrimination claim. An employer's intent is immaterial when analyzing an FMLA interference claim. So regardless of whether Ms. Kelchin honestly believed something, or held this belief in good faith, if Ms. Kelchin was wrong and Ms. Huber really did notify her employer as soon as practicable under the statute, Ms. Huber was entitled to FMLA, and when her employer terminated her for her protected absences, they violated the FMLA. Are the requests for FMLA paperwork disputed? They're not disputed, Your Honor. What Westar claims is that they had made the decision to terminate prior to receiving those requests for FMLA paperwork. Now, Westar had not conveyed that decision to Ms. Huber, first of all, and also it's our position that even though Westar may have made that decision prior to Ms. Huber uttering the letters FMLA, she still had provided enough information prior to them making that termination decision that they should have been aware that she was entitled to leave. And there's a, I'm running into my rebuttal time here, but there's a chart in the appellant's reply brief on page 2 where we've laid out all of the information that an employee needs to provide to an employer to show that they're eligible, and corresponding record citations of how Ms. Huber provided that information. If I could reserve my remaining time for rebuttal. You may. Thank you for your argument. Thank you. Mr. Winkleman, we'll hear from you. May I proceed? You may. Good afternoon, Your Honors, and may it please the Court. Stephen Winkleman with the EEOC. In our view, two principles resolve this case. The first is that in a disability discrimination action, an employer's honest belief that an employee violated a workplace policy is not a complete defense. Instead, the employer's belief must be assessed in light of the surrounding circumstances, which may undermine or even defeat the employer's reliance on a workplace policy violation as a basis for discipline. The second principle is that an employer acts on the basis of disability when its determination that an employee violated a workplace policy is premised on a belief about the existence, nature, or extent of the disability. Applying those principles in this case. I didn't understand. You're speaking so soft, I didn't understand that. I'm sorry, Your Honor? I didn't understand that second point. You're speaking very softly. I'm sorry, Your Honor. The second principle is that an employer acts on the basis of disability when its determination that an employee violated a workplace policy is premised on a belief about the existence, nature, or extent of the disability. Applying those principles in this case, several key facts show that Westar's determination that Ms. Huber violated its calling policy in December 2019 hinged on its beliefs about whether and how her diabetic episode affected her abilities, and that under the company's own policies, her impairment was a relevant and potentially dispositive consideration in determining whether she had violated the policy. First, there's the language of the policy itself. The policy required employees to provide advance notice of absences when possible. That language carved out an exception for exigent or emergency circumstances outside the employee's control that may have prevented them from providing advance notice of an absence. Westar's own understanding of the policy confirms that reading. Amy Rowe, Westar's human resources representative, testified that if an employee got in a car accident that prevented them from calling in, their failure to provide advance notice would not violate the policy. That assumes car accidents are infrequent, right? I'm not sure if anything about that turns on the frequency of the car accidents.  So you have one every day? This is like the loss of grandparents to the teacher, professor in college. Go ahead. Yes. If they think that that statement is just entirely false, that would be a different story. But the last is. . . How does that apply here? Aren't there three or four occasions where she did not make work? No notice? There were other occasions. However, there doesn't appear to be any dispute that in this. . . She had been warned about it. She had been warned about it. That's correct. But in this instance, there seems to be no dispute that this final, her final set of absences in December 2019 were the last straw, so to speak, that they were the but-for cause of her ultimate termination. But she had been told about that before. The last warning she received said it could lead to further disciplinary action up to and including termination. Yes, if she violated the policy. But that comes to the. . . Westerner's reaction to her diabetic episode in this case, which is when she. . . Although she has consistently maintained that her diabetic episode prevented her from calling in, Westerner has never argued that that is not a valid reason under its policies to excuse her absence or her failure to call in. Instead, it is argued exclusively that it didn't believe that her diabetic episode was so severe that it prevented her from calling in or providing advance notice. So under your view of the case, what would the jury be asked to decide? Would it be asked to decide whether Westhart correctly believed that she was able to call in or. . . It wouldn't be. . . Go ahead. Tell me what. Yes, it wouldn't be whether its determination was correct, but rather whether it acted based on a belief about the existence, nature, or extent of her disability in determining whether she had violated the policy. What if the company acted on the belief about the disability that was correct, that it didn't prevent her from calling? Are you saying the company would still be liable? I think if it. . . In the scenario where the employer does some sort of reasonable inquiry, determines that or makes a determination that the employee was able to call in, I think that would still establish causation that they were acting on the basis of the disability. The standard you're proposing, has any other circuit court of appeals adopted precisely what you're proposing here? Not in this context where it's about whether the conduct violated the policy in the first place, but the individualized inquiry, courts require that in other contexts, in hiring contexts, in determining whether and when a reasonable accommodation is required. And the reason for that is that it prevents an employer from acting based on. . . Well, not all of those are accommodation cases. That would be true in the hiring context as well, where if an employer is trying to determine whether an employee with a disability can perform the essential functions of the job with or without accommodation, they would still be required to conduct an individualized inquiry as to whether the employee can do that. And that's the First Circuit's decision in Gillen, I think is exactly that scenario, where a candidate was applying for a job as an EMT, had only one hand, and the employer made a snap judgment that that person was not capable of doing the job. What the First Circuit said in that case is the absence of any individualized inquiry into the person's actual abilities would provide evidence from which a jury could infer that the company was acting based on unfounded assumptions or preconceived notions about the disability. Well, that's why I asked you, what if they were correct? You say unfounded assumptions and preconceived notions. But what if they do an inquiry and they determine, no, this didn't prevent her from calling? I think that would still . . . Go ahead. I think that would still establish causation. They may have other defenses. But in this case, the court doesn't even need to decide that because Westar didn't conduct any type of meaningful inquiry into whether or how her disability affected her abilities to call in. And, in fact, when Ms. Huber affirmatively . . . But didn't they know that she was calling her son? They did believe, or she had told them, I believe, that she had called her son and had made calls to her boyfriend at the time. But the evidence, I believe, is that she was incoherent on those calls, was not lucid, was still confused, disoriented, and explained that to Kelch. And much of that appears in Kelch's notes about that conversation that Ms. Huber expressed to her. What's the evidence she was incoherent? The testimony from her boyfriend and her son, who she had made calls to at that time, as well as her own explanations to Kelch. Did both her boyfriend and the son testify that all they were able to ascertain from those conversations that she was hospitalized, but they weren't sure why? I don't know that that's the only thing they were able to infer from those discussions. I know they each, I believe, had several discussions with her, had confirmed that she was in the hospital, that she was being medicated and sedated, and had suffered a diabetic episode. And both had testified that at various points in that conversation, those conversations, she was either incomprehensible or not making sense. Very well. Thank you for your argument. Thank you. Mr. Walden, we'll hear from you. Your Honors, may it please the Court, Ray Walden for Westar Foods, Incorporated. Two facts. To start with, Tanya Huber was the key employee, literally. She had the key. She had the first shift, 5 a.m. She was supposed to be there, open the door. If the door doesn't get opened by her, the store doesn't open, as was found out on December 20th of 2019, when the store, indeed, was not opened. And five hours later, Westar gets a call from a customer saying, hey, your store is not open. This is Hardee's. Okay, that's a key fact, which plays right into the policy that, especially for a manager, I mean, the policy was more across the board, but it particularly is important for a manager with the key to open the door, that you call in if you're going to miss a shift. For whatever reason, you call in. Okay, the next key fact is she didn't do it on December 20th. She calls her boyfriend, as we find out, talks to him about 50 minutes, and she called him even before her 5 o'clock shift was going to begin, 45 minutes, I think it was. Then she drives herself to her doctor's office. She calls her son somewhere in that process. She never calls her supervisor, Ms. Kelchin. Another key fact, Ms. Kelchin learns from the son, talking to him late in the afternoon of the 20th, that she called the son. When she talks to Ms. Huber the next day, about three hours after she was supposed to have been opening the door that day on the 21st, she finds out, oh, yeah, she talked to her son, she talked to her boyfriend, she talked to, I mean, she had driven herself to the doctor's office. Those are key facts in that, you know, that is a reasonable basis for believing that she, you know, that Kelchin knew, or was honestly believing, if you could do all those things, you can make a simple call. I think that was the word she kept using when she was getting angry on the phone with her about not making the simple call to let him know. If her call had been coming in, and incoherent even, you know, to Kelchin, you know, before the shift began, or somewhere earlier in that, you know, either of those days, well, that might have been a clue about, hey, you know, we still have to do something here, we've got an incoherent manager calling. She didn't make that call. She calls her boyfriend, she calls her son, she calls the doctor's office, she goes there and spends the day, never gives the call back that day, gives the call three hours late the next day, admitting that she had slept in. Counsel, is there any dispute about the timing of the decision to terminate, and who made that decision? I don't believe there's any dispute about that. I mean, we've kind of taken the lead. What's the undisputed facts? Excuse me? Then what are the undisputed facts about the decision, who made it, and when? Well, of course, after Kelchin talked with Huber, she calls Mr. Westermajor, I think that's how it's pronounced, who's the top boss, discusses what she knows with him. He made the decision. Whether you say they made the decision together, or that he made it, I don't think really matters. The decision was made on the basis of her information. I think that's undisputed. And it was made the morning of December 21st. Then they tried to... The day after the absence, is that the date? That was the second day that she missed work, yes, and didn't call. But when contact was actually made, more information was gathered, and it was discovered, you know, these facts about why she could have called, if she can call other people, if she can actually drive herself to her doctor's office. On the question about key facts, what about the fact that, in the light most favorable of the plaintiff, the supervisor Kelchin falsely denied knowing that Huber had a disability? Why wouldn't that be sufficient evidence of pretext to make this a jury case under the Supreme Court's decision in Reeves? I don't think there's any evidence that she falsely denied knowing about the disability. It's kind of a timing thing. She wasn't the one who was, you know, the district manager when those discussions, you know, much earlier in the year, several months earlier, you know, had taken place about storage of insulin and about timing of, you know, of when she could take meal breaks. So you don't agree that, in the light most favorable, a jury could find that she falsely denied the knowledge? I don't believe that there is that evidence there. What if the jury could find that? Yeah, she heard about the diabetes episode on the day, you know, the second day there. Right. And then she said she didn't know that Huber was diabetic. I guess I didn't read her as saying, you know, in any flat terms that she never knew at any Take my hypothetical then. Let's say she did falsely deny knowing about the disability. Would that make it a jury case? I still don't believe so. I think with, you know, with the other factors of, you know, because it wasn't, you know, the reason for the firing was not making the call. So if just the fact of having diabetes, you know, knowing that somebody has diabetes isn't telling you, well, they're not able to call, you know, make a quick call, say, I can't come in because, you know, I've got a medical thing going on. You know, those two are unrelated, really, the fact of knowing about diabetes and the real basis for, you know, for the adverse employment action. But wasn't it a fact, isn't it a fact dispute in the record as to whether she could, in fact, call? I think the fact, you know, the main fact here or the real, the only really relevant fact is what does Westar know? What does Kelchin know? And what is reasonable to believe? You know, we're on the pretext analysis here. And, you know, what she knows and bases her reasonable belief on is somebody drove herself somewhere and made other calls. So I think any, you know, she said she's not a medical doctor. I don't think you have to get into some consultation with medical experts, you know, when you're making your decision whether to fire a manager for not showing up and not calling. Well, the government argues that we do, that there are cases out there that require an individualized inquiry. I still have a brief coming in response to theirs. I will go more into that then. I just don't believe that there's case law that can support that. It certainly wouldn't come from, you know, from the statute of 42 U.S.C. 12.1.12, you know, that has to do with, you know, barring discrimination on the basis of disability. You know, that's not the, you know, that's, you know, there's really, you know, if the Supreme Court and all of the circuit courts, including this one, were ever serious about it not being an honest belief of the employer that really matters on the pretext, then the EEOC is just, you know, really trying to push into a whole new level beyond the statutory authority, you know, to you've got, you know, they call it a, you know, mandatory investigation. Nobody's ever required, you know, that when there's a simple violation of a rule, a neutral rule. It's a neutral decision, you know, because of violation of a neutral rule, you know, that has nothing to do with the disability. Now, of course, the panel majority says, well, but somewhere in that causal chain there is, you know, the fact, you know, some connection with, well, she didn't show up for work because of her diabetes, and she didn't call those, there's some causal connection there. Well, I don't think that's there that the evidence, you know, establishes that. Now, the EEOC says, well, maybe they should have established whether there was a causal connection by doing an investigation to get, what, into the head of the employee, of the manager, you know, retroactively. How are you going to get at that? Well, isn't that the pretext step? It seems you're conflating the two steps. You can present, and I think the district court found that there was a legitimate nondiscriminatory reason that Westar gave, which is violation of the policy, give them the good faith belief at that stage, but then you still have to get to the pretext, which is the messy part.  Right. So the good faith, just because you put forth a good faith belief doesn't answer the question of pretext. Well, but the good faith belief is based on actual, you know, not just evidence, but uncontroverted evidence of what would, you know, that she did make those calls to other people. She did drive, and Ms. Kelchin did know about that and passed, you know, her information on, and the decision was made, you know, to fire. I think, you know, with all of that in place, you know, there's, it would just be, it would be a lose. I think, you know, Judge Stossin in dissent, you know, called it a lose-lose situation for an employer, you know, or as I would quote from Monty Python, a character said, well, what chance does that give me? You know, if you have to either conduct some investigation before you can take the most basic action, you know, with a manager who didn't call in, or face litigation, which is fueled by all the ambiguities of what you should have investigated, and what wouldn't you have found if you'd investigated further, and how do you actually even find anything out about what this person could have been able to do at any particular time as the day went on? Well, we knew she could make a call. We knew she could drive herself. You know, as I guess the investigation played out through discovery, we found out she was on the phone for 45 minutes with her boyfriend. At the same time, she was supposed to be opening the door. You know, that, you know, I don't think you need an investigation to go deeper into that. You know, in this case, and I don't think there's any kind of a requirement, you know, kind of generally legally for an employer to undertake that kind of thing. Now, there's talk about the accommodation from the past and what anybody knew in the past. What does that have to do with anything as far as showing, well, I mean, they say an accommodation and discrimination are just kind of, you know, two sides of the same coin. But that doesn't make any sense. Because they're talking about requests for accommodation that were made several months before. And she was basically told, accommodate yourself. You're the manager. You can figure this out. You need to store something at room temperature. Figure out how to do it. You manage the store. If you need to take your lunch breaks at some time that accommodates when you need to take medicine, do it. You're the manager. Figure it out. And Ms. Huber figured it out. There was no issue after that. I mean, she figured it out. And for months had been doing whatever she needed to do. And they're more to the point, there's no evidence or suggestion that any of that having to do with medicine storage or, you know, or the food, you know, when she could eat her food, you know, had anything to do with her going into, you know, any sort of condition on December 20 or 21. Or could have prevented, you know, her from making any calls because of that condition. So, yeah, the policy says when possible. And how do you get now what's when, you know, what is possible? How about what is done, what somebody actually does? You know, the driving yourself and the calls. You know, it is pretty clear evidence the policy was violated because it actually was possible. Well, is it really so clear? I mean, let's just be perfectly blunt about it. Like, people make improvident decisions when their minds are clouded by illness, right? And if you've ever known anyone who's having a diabetic incident, they're capable of getting in cars and trying to drive to the doctor. That happens. If you know people with diabetes, you understand that they can carry on a conversation with somebody and be just absolutely incomprehensible to the person who's listening. And it's also absolutely true that a person with diabetes might reach out to their immediate family members and not ever have it cross their minds that they've got a work issue going on. I mean, you act as though that the only rational explanation for a person who's on the verge of going into a diabetic coma is that they are, you know, still functioning on, like, all eight cylinders right up until the time they crash and burn. Well, as Ms. Kelschen, you know, this was mentioned. You know, she said she doesn't really know that much about diabetes. I guess I don't either. I mean, you know, coming into this, you know, that, you know, what it all could entail. But we're looking at it from the point of view of, you know, what a reasonable belief was by an employer. When you have the actual evidence, somebody called somebody, somebody drove. Now, maybe hypothetically, you know, they might have done that dangerously. They might have, you know, I don't know why you can call one person and not another if they're all on your speed dial, supposedly. You don't know why you might call your family before you call your boss? I don't think that gets into that it was a pretext for, you know, for making a decision on. See, I don't see this being particularly different than a car accident, right? I mean, there's this twilight zone, you know, and perhaps it's colored, you know, by my knowledge of people with diabetes. But, I mean, I'm just telling you, I mean, people get to this complete and utter twilight zone where they function in some ways, but they don't function well at all. Well, yeah, the EEOC gave that example of the car accident. Well, didn't your HR person give the example of the car accident? Didn't they agree that that would be outside of the policy? Well, right, but the premise, you know, when you're talking about a car accident, is that the car accident causes a condition that makes you unable to call. You know, if you had a car accident and you can still make the call to somebody, well, why can't you call your boss to let him know that you had a car accident and can't come in today? You know, that would, and we're inside of the head of Ms. Kelchin mainly, but also her boss, about, well, what is possible in terms of the policy? And what's possible is what was done, you know, from that point of view. She did it. She could have done it, you know, for us. She could have let us know. So you don't think it's a fact dispute at all as to whether the fact, whether or not she was able to call her work simply because she called her boyfriend? In your view, that's not a fact dispute? I think that's not a fact dispute when you're applying the proper McDonnell-Douglas framework analysis that, you know, you're into the pretext phase and you're looking at was it an honest belief. It doesn't have to be the correct. It doesn't have to be investigated. Was the evidence that she just simply didn't remember calling her boyfriend or her son? Well, I thought the evidence was that she told, you know, that she told Ms. Kelchin that she had talked to her son. But the evidence in the record is that she has no recollection of the phone call itself. Well, yeah, she said that at some point, but also we had, you know, Kelchin saying, you know, that she told her this. And that's not a question of fact? I guess in that sense, anybody can create a question of fact just by coming up with whatever they have to, you know, to try to stave off a summary judgment. And I don't think that that's all you have to do, you know, when you're into the pretext analysis of McDonnell-Douglas. You know, you have to have substantial evidence that, you know, that's showing a reasonable or that was not a reasonable basis, that there was some basis for, you know, a jury could say, no, they're just lying about that. They've been inconsistent about that. You know, those facts aren't true. Well, you know, the facts are admitted, you know, that she made those calls and that she, you know, did drive herself. And that she was talking about that the next day that she had done so. So I mean, at the bottom of it all is what is the standard? I mean, this Court took the case and vacated. And so it's up to you now to say what the Eighth Circuit standard is. And I believe that Judge Fass had it right that, you know, the standard is what, you know, all these cases have been saying and not what the majority or especially what the EEOC is now wanting. You know, basically they want, you know, this Court to take on, you know, to push their agenda now. I'd ask that you decline that and affirm the district court's decision. Thank you, Your Honor. Very well. Thank you for your argument. We'll hear rebuttal. Thank you. The artist Chuck Close suffered from a condition called prosopagnosia. Why am I bringing this up? Prosopagnosia is face blindness. If anyone's familiar with Chuck Close's art, he was a, he drew portraits, enormous portraits of people's faces. But how weird is that? He was face blind and he drew these portraits. We're not in a great position to understand the nuances of every disability. And certainly employers are not in a great position to do so either, for the most part. So they can't, but we can't allow them to just make unfounded assumptions and have that be the standard. What if Cindy Kelchin had thought, I don't believe diabetes exists. So I think that Tonya Huber could have made that phone call. And what if she really thought it? This would gut the ADA. We need employers to ask questions. We need them to follow up on information. I think honest belief authorities would not stretch the concept to the ridiculous extent you'd suggest. And I think that our view is consistent with honest belief doctrine, Your Honor, because I'm not saying they have to be right. I'm not saying they have to interview every person Tonya Huber asks them to interview. I'm saying they need to ask the kinds of questions that the average person asks when they don't know what's going on. And if they don't ask those questions, it might be a sign that they've not acted in good faith. Could they have reached the conclusion that this had happened before, and even if diabetes may have played some role, or she had a diabetic attack, use this other evidence to ultimately conclude that this was just a pattern, a pattern of misbehavior, and that that was their reasonable belief. And that maybe she did have a diabetic episode, but the fact that she could call other people during that made their belief reasonable. I'm out of time, but can I answer your question? You may. Thank you. Well, first of all, I think really we're only talking about one call here, because the employer didn't become aware of any of the calls with the boyfriend or any of that until much later, so that could not be part of their honest belief. They didn't have knowledge of that at all. In terms of the pattern, her having been absent before, I think the employer needs to look at this particular absence, right? And if the employee introduces this information, well, I was at the doctor's office, I couldn't talk, I didn't know where I was, then I think that is what kind of triggers the employer's obligation. I don't understand why that's the case. I mean, the reason for these policies is, and a step-by-step enforcement, is deterrence, for one thing, and the neighboring, the neighboring employee, say, well, she got away with it three times, but she went to the EEOC and they got her off the hook. I don't think your response really addresses Judge Strass' question about pattern. You don't just look at the last one when there's a pattern, because the policy and the step-by-step enforcement is to, among other things, deterrence. And among other things, deter managers from not opening stores. Respectfully, Your Honor, I don't think you can deter someone from having hypoglycemia, though. They can't prevent that behavior. And also, the HR representative said that there are exceptions to the policy. If someone got into a car accident, they would need to notify them as soon as possible. Very well. Thank you for your argument. Thank you to all counsel. The case is submitted and the court will file a decision in due course.